UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

| | |
|---|---|
| STEPHANIE MARIE BUCHANAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 2:15-CV-00005-CDP |
| ) | |
| HARI KAPUR, M.D. and ) | **JURY TRIAL DEMANDED** |
| CORIZON HEALTH ) | |
| ) | |
| Defendants. ) | |

## **PLAINTIFF STEPHANIE MARIE BUCHANAN'S FIRST AMENDED COMPLAINT**

COMES NOW Plaintiff Stephanie Marie Buchanan and for her First Amended Complaint states as follows:

### INTRODUCTION

1. The allegations in this Complaint describe an unjustifiable indifference and utter disregard to the medical well-being of a person imprisoned within the Missouri Department of Corrections. Defendants consciously ignored Ms. Buchanan's serious medical issues on multiple occasions over the course of years, and continue to do so.

2. Specifically, as explained in more detail below, Defendants knowingly disregarded the severe and permanent risks, and consequences, suffered by Ms. Buchanan as a result of (a) a belatedly diagnosed and inadequately treated heart attack in mid-2012 and (b) a belatedly diagnosed, preventable, and inadequately treated collapsed lung in early 2013.

3. Defendants failed, and continue to fail, to provide the correct treatment and medication to alleviate Plaintiff's suffering, and to prevent future risks faced by Ms. Buchanan as a result of Defendants grossly and recklessly incompetent inaction.

SLC-7518182

**PARTIES**

4.     Plaintiff Stephanie Marie Buchanan is an individual residing at the Women's Eastern Reception Diagnostic and Correctional Center ("WERDCC") located in Vandalia, Missouri.  Plaintiff is and was at all times pertinent to this litigation an inmate in the Missouri Department of Corrections ("MDOC").

5.     Defendant Corizon Health ("Corizon") is a corporation headquartered in Brentwood, Tennessee.  According to its website, Corizon "provides quality healthcare services to 107 clients at 531 facilities across the country serving over 345,000 inmates in 27 states" and "is the leading provider of correctional healthcare services in the United States." *See* http://www.corizonhealth.com/About-Corizon/Locations.  At all times pertinent hereto, Corizon held itself out as a professional healthcare provider with specialized expertise in providing medical care in correctional facilities, and was under contract to provide medical services to inmates at WERDCC, including Ms. Buchanan.  At all times mentioned herein, Defendant Corizon acted individually and by and through its agents, servants, and employees, including but not limited to Defendants Kapur, Rice, and Horn.

6.     Defendant Hari Kapur, M.D. ("Dr. Kapur") is and was, at all times pertinent hereto, licensed to practice medicine in the State of Missouri and is, upon information and belief, a resident of the State of Missouri.  Dr. Kapur was a general practitioner based at WERDCC at all times relevant to this action, acting individually and as the employee or agent of Corizon, within the scope of his employment or agency.

**JURISDICTION AND VENUE**

7.     This Court has original jurisdiction over Plaintiff's claims under 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the United States Constitution pursuant

to 28 U.S.C. § 1343. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

8. Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District. All Defendants are either residents of the State of Missouri or otherwise have sufficient contacts with the State of Missouri.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

9. Upon information and belief, at all times pertinent hereto, Corizon was retained under contract with the MDOC to provide medical services to inmates at WERDCC, including Ms. Buchanan. Upon information and belief, the profits earned by Corizon are directly impacted by Corizon's expenditures on inmate care, providing Corizon with a monetary incentive to minimize the amount of funds spent on inmate medical issues.

10. Ms. Buchanan has been incarcerated at WERDCC since on or about February 17, 2011. She is wheelchair-bound and has been since on or about June 1, 2011, due to issues with her spine which continue to deteriorate.

11. Defendants have taken no steps to provide treatment which might allow Ms. Buchanan to walk again. Rather, Defendants have used Ms. Buchanan's physical disability as an excuse to deny her adequate medical treatment with respect to the later-occurring, and potentially even more serious, medical issues discussed below, which have arisen after Ms. Buchanan became wheelchair-bound.

### Defendants' Failure to Timely Diagnose and Adequately Treat a Heart Attack Suffered by Ms. Buchanan in July 2012

12. On or about July 5, 2012, Ms. Buchanan "self-declared," *i.e.*, went to the WERDCC-equivalent of the emergency room, complaining of a heart attack. Specifically, Ms.

3

Buchanan was wheeled to the emergency room by another inmate. Once there, Ms. Buchanan—holding her chest, sweating profusely, nauseous, crying, and begging to be taken to the hospital—complained to Corizon medical staff of severe chest pain.

13.     The on-call nurse told Ms. Buchanan that the pain was back-related, not cardiac-related. She did so despite conducting no tests to reach this conclusion; despite not even taking Ms. Buchanan's vital signs. She told Ms. Buchanan to return to her housing unit. No medication or other treatment was provided to Ms. Buchanan.

14.     A few days later, on or about July 8, 2012, Ms. Buchanan again self-declared in the emergency room with similar complaints and, again, she was told by Corizon medical staff that the pain was back-related, not cardiac related. The on-call nurse did so despite conducting no tests to reach this conclusion. She told Ms. Buchanan to return to her housing unit. No medication or other treatment was provided to Ms. Buchanan.

15.     On or about July 13, 2012, Ms. Buchanan went to sick call, *i.e.*, the standard medical care unit at WERDCC, with similar complaints, demanding to see a doctor. Corizon medical staff told Ms. Buchanan that she could not see a doctor because no appointment was scheduled. Once more, Ms. Buchanan was told—without tests to justify the assessment—that her pain was back-related, not cardiac-related. The on-call nurse told Ms. Buchanan to return to her housing unit. No medication or other treatment was provided to Ms. Buchanan.

16.     Ms. Buchanan had a prescheduled appointment with Dr. Kapur, regarding a separate matter, on or about July 15, 2012. She reported to her appointment with Dr. Kapur. Dr. Kapur had available to him the records indicating Ms. Buchanan's recently reported circumstances.

17.     During the appointment, Ms. Buchanan tried to explain to Dr. Kapur the events of the last week—that she had suffered a heart attack and continued to feel severe chest pain.

4

Dr. Kapur refused to address the issue, informing Ms. Buchanan that her appointment was not for chest pain; that "this is not what I am seeing you for today."

18. Accordingly, at the appointment with Dr. Kapur on or about July 15, 2012, no tests were conducted to determine whether Ms. Buchanan had suffered a heart attack, and Dr. Kapur provided no medication or other treatment for this trauma.

19. Approximately two (2) weeks later, on or about July 30, 2012, Ms. Buchanan's family chose to intervene, based on their communications with Ms. Buchanan regarding the trauma suffered by Ms. Buchanan earlier that month, and Ms. Buchanan's continuing pain.

20. Ms. Buchanan's family demanded that an electrocardiogram (EKG) be performed by Corizon medical staff, to determine whether Ms. Buchanan had suffered a heart attack. And finally, on or about July 30, 2012, an EKG was performed by an on-call nurse. The EKG confirmed that Ms. Buchanan had suffered a heart attack.

21. Despite the results of the EKG, Ms. Buchanan's request to see Dr. Kapur that day was denied by Corizon medical staff. And Ms. Buchanan was provided no medication or other treatment.

22. It was not until nearly two weeks later, on or about August 12, 2012, that Ms. Buchanan saw Dr. Kapur. Dr. Kapur advised Ms. Buchanan that she had suffered a heart attack and was currently suffering from a cardiac blockage and cardiac scarring. Ms. Buchanan was provided no medication or other treatment.

23. Dr. Kapur threatened Ms. Buchanan during that visit, belligerently scolding Ms. Buchanan that she could never claim the heart attack occurred at WERDCC—that she could would never be able to document it.

24. A few days later, on or about August 15, 2012, Dr. Kapur called Ms. Buchanan in to see him. Dr. Kapur told Ms. Buchanan to stop pursuing her complaint that she had

5

suffered a heart attack at WERDCC, and he threatened to take away her wheelchair if she continued to do so.  Ms. Buchanan was provided no medication or other treatment.

25. The next day, on or about August 16, 2012, after weeks of requests from Ms. Buchanan and her family, Ms. Buchanan was finally approved to see an off-site cardiologist—Dr. Conrad Balcer in Jefferson City, Missouri—for a stress test and consultation.

26. Ms. Buchanan had an appointment with Dr. Balcer on or about September 10, 2012, approximately six (6) weeks after suffering a heart attack.  A stress test was conducted.  Upon information and belief, the results of the stress test indicated that Ms. Buchanan had suffered severe cardiac injury and/or was in a state of poor cardiac health.

27. After Ms. Buchanan's appointment with Dr. Balcer, on or about September 14, 2012, Ms. Buchanan was called to the medical unit at WERDCC, where Corizon medical staff advised Ms. Buchanan that no further cardiac testing would be performed, no additional cardiac treatment would be administered, and her cardiac file would be closed.

28. Specifically, Ms. Buchanan was advised that no further tests or procedures could be conducted due—yet again as an excuse—to Ms. Buchanan's back.  Nothing was done by Defendants at that time, however, to treat either Ms. Buchanan's back or her cardiac injury.

29. Nonetheless, Ms. Buchanan once more saw Dr. Balcer in Jefferson City on or about October 1, 2012.  An EKG was performed, and the results were abnormal, indicating cardiac injury, including a blockage.

30. During her appointment with Dr. Balcer, Ms. Buchanan specifically requested treatment for her blockage.  No such treatment was provided, or planned for, and no such treatment has been provided to Ms. Buchanan to date.

31. The consequences of failure to timely diagnose and treat a heart attack are substantial.  Among other things, heart attack sufferers who are not timely treated face an

increased risk of mortality—compared to those who are timely treated—after suffering an attack.  In addition, the longer the period between a heart attack and proper diagnosis and treatment, the more likely it is that the attack will result in serious damage to the heart.

32. The failure of Dr. Kapur and Corizon medical staff to (a) timely diagnose and timely and adequately treat Ms. Buchanan's heart attack, (b) timely see that Ms. Buchanan was evaluated by a heart specialist, *i.e.*, a cardiologist, and (c) later adequately treat Ms. Buchanan's resulting cardiac scarring and blockage have left Ms. Buchanan in serious and chronic pain, as well as at a high risk for future, severe, and potentially life-threatening cardiac injury.  Among other things, Ms. Buchanan feels constant stabbing pain on her left side, cannot sleep on her left side, and routinely experiences numbness in her left extremities (arms, legs, fingers, and feet).

### Defendants' Failure to Prevent, Timely Diagnose and Adequately Treat a Collapsed Lung Suffered by Ms. Buchanan in Early 2013

33. In January 2013, Ms. Buchanan developed a serious respiratory infection, displaying symptoms including sharp chest pain and wheezing.

34. On or about January 31, 2013, Ms. Buchanan sought medical attention for her condition.  At sick call, Corizon medical staff prescribed Ms. Buchanan antibiotics and steroids.  A chest x-ray was ordered.

35. On or about February 1, 2013, a chest x-ray was performed by Corizon medical staff which, upon information and belief, revealed to Corizon medical staff that Ms. Buchanan was in great danger of suffering what would (albeit not until months later) be diagnosed as atelectasis in her left lung—more commonly known as a collapsed lung.

36. Atelectasis collapses the lung when, typically, either (a) a blocked airway or (b) pressure from outside the lung causes the air sacs within the lung—the alveoli—to deflate.

37. In some cases, atelectasis will heal on its own. More commonly, however, treatment requires suctioning, from the lung, of the blockages associated with atelectasis. Atelectasis is preventable. And the consequences of a failure to prevent atelectasis—*i.e.*, a collapsed lung—are severe, ranging from leakage of air from the lung, to scarring of the lung, to increased risk of respiratory failure.

38. Defendants failed to take adequate measures to prevent Ms. Buchanan from suffering a collapsed lung. They failed to timely diagnose the condition, and they have to date failed to adequately treat it.

39. On or about February 7, 2013, approximately a week after the x-ray was taken, Ms. Buchanan saw Dr. Kapur, who was aware of the x-ray having been performed and of its results. Despite his awareness of the severity of Ms. Buchanan's circumstances, Dr. Kapur treated Ms. Buchanan's condition as an everyday respiratory infection, giving Ms. Buchanan cough medication. Moreover, Dr. Kapur refused to discuss the x-ray results with Ms. Buchanan.

40. Ms. Buchanan's condition continued to worsen. On or about March 1, 2013, Ms. Buchanan reported to sick call due to sharp, stabbing pains in her left breast and shoulder. She presented with what Corizon medical staff diagnosed as "rales and rubs." ("Rales" are abnormal breathing sounds characterized by small clicking, bubbling, or rattling in the lungs. "Rubs" are abnormal breathing sounds characterized by squeaking or grating, indicating a rubbing together of the pleural lining, which separates the lung from the chest wall.)

41. Corizon medical staff continued to provide Ms. Buchanan with only minimal treatment, ignoring clear signs that this treatment was ineffective in treating Ms. Buchanan's symptoms and any underlying infection, and despite clear indications of the serious risk that

Ms. Buchanan had suffered, or imminently would suffer, a collapsed lung. Defendants took no steps to prevent further damage.

42. Months after Ms. Buchanan's initial symptoms, on or about April 25, 2013, Dr. William Rice at WERDCC met with Ms. Buchanan and, seeing that the treatment provided to Ms. Buchanan by Corizon medical staff including Dr. Kapur was ineffective, ordered a CT Scan.

43. It was not until an additional month later, however, as Ms. Buchanan's symptoms continued to linger and worsen, that a CT Scan was performed on or about May 24, 2013, at the Capital Region Medical Center in Jefferson City, Missouri.

44. On or about May 29, 2013, Ms. Buchanan met with Dr. Kapur to go over the results of the CT Scan. Dr. Kapur, who had by this time long been aware of Ms. Buchanan's risk of suffering a collapsed lung, acknowledged in this meeting that Ms. Buchanan was in fact suffering atelectasis, *i.e.*, a collapsed lung. Nevertheless, Dr. Kapur once again refused to adequately treat Ms. Buchanan's condition, prescribing another round of antibiotics and cough pills.

45. The failure of Dr. Kapur and Corizon medical staff to (a) timely and adequately treat Ms. Buchanan's severe respiratory issues in order to prevent her from suffering a collapsed lung and (b) adequately provide reparative treatment for the collapsed lung Ms. Buchanan suffered as a result have left Ms. Buchanan in serious and chronic pain, caused permanent damaged to her lung tissue, and placed her at a higher risk of lung disease and secondary infection. Among other things, Ms. Buchanan feels constant stabbing pain on her left side, cannot sleep on her left side, and is routinely short of breath.

**Defendants' Continuing Failure to Treat Ms. Buchanan's
Serious Cardiac and Pulmonary Injuries**

46. In early 2013, Ms. Buchanan initiated an inmate grievance with the MDOC. In her grievance, Ms. Buchanan recounted in detail Defendants' failures to treat her cardiac and pulmonary injuries, and the injuries she has suffered as a result.

47. In response, Dr. Kapur wrongly advised Ms. Buchanan that she had received all medically necessary health care.

48. In mid-2013, Ms. Buchanan followed up with an inmate grievance appeal with the MDOC. In response, Dr. Tom Bredeman, Regional Medical Director for Corizon, wrongly advised Ms. Buchanan that timely and appropriate healthcare had been provided to her.

49. Ms. Buchanan's grievance led to no meaningful change in her treatment by Defendants. Ms. Buchanan's injuries have only worsened and continue to increase in severity.

50. On or about April 14, 2014, Dr. Kapur advised Ms. Buchanan that Dr. Bredeman—who, upon information and belief, oversees all medical treatment at WERDCC, including determining when inmates can and should receive medical treatment outside the facility—would be responsible for any and all future decisions regarding the course of Ms. Buchanan's medical treatment.

51. No meaningful change in Ms. Buchanan's treatment has occurred under Dr. Bredeman's oversight. Again, Ms. Buchanan's injuries have only worsened and continue to increase in severity. Defendants' failure to provide Ms. Buchanan with adequate medical treatment continues to this day.

52. As a direct and proximate result of Defendants' actions, Ms. Buchanan has incurred, and will continue to incur, injury and damages including, but not limited to:

    (a)    cardiac blockage and scarring;

(b) an increased risk of cardiac disease;

(c) decreased circulation, limiting Ms. Buchanan's ability to function on a daily basis, and threatening the health of internal organs other than the heart;

(d) scarring of the lung and the death of lung tissue;

(e) an increased risk of respiratory failure;

(f) daily difficulty breathing, and sharp pain and numbness on the left side of her body;

(g) a severely and permanently diminished ability to engage in normal daily activities and enjoyments of life;

(h) past, present, and future physical, mental, and emotional anguish;

(i) the need for additional future medical care, testing, evaluation, medication to an extent not yet determined, and expenses related thereto;

(j) the past, present, and future need for medical equipment and devices to assist in her care, treatment, and daily living activities to an extent not yet determined, and expenses related thereto; and

(k) other damages and injuries currently being investigated but yet to be ascertained.

## COUNT I – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
### (Against Dr. Kapur)

53. Plaintiff realleges and incorporates Paragraphs 1 through 52 as though fully set forth herein.

54. Ms. Buchanan's heart attack and collapsed lung constituted serious medical needs recognizable by a layperson as necessitating immediate medical attention.

55. Ms. Buchanan's severe pain in connection with both her heart attack and collapsed lung also constituted serious medical needs recognizable by a layperson as necessitating immediate medical attention.

56. Dr. Kapur had actual knowledge that Ms. Buchanan faced a substantial risk of actual harm from her heart attack and, later, from her collapsed lung. Dr. Kapur also had actual knowledge that Ms. Buchanan faced a substantial risk of actual harm from continued severe pain.

57. Dr. Kapur consciously refused to take reasonable steps to diagnosis and treat Ms. Buchanan's heart attack and, later, her collapsed lung including, but not limited to, providing grossly and recklessly inadequate care and refusing to provide adequate evaluation and treatment. Dr. Kapur consciously refused to provide reasonable treatment for Plaintiff's severe pain.

58. Dr. Kapur's deliberate indifference to Ms. Buchanan's serious medical needs constituted a violation of Ms. Buchanan's rights under the Eighth Amendment to the United States Constitution under the color of state law.

59. Dr. Kapur's deliberate indifference to Ms. Buchanan's serious medical needs proximately caused, or contributed to cause, the injuries and damages set forth herein.

60. Ms. Buchanan may seek remedies for the injuries and damages caused by such constitutional violations pursuant to 42 U.S.C. § 1983. Attorney's fees and costs may be awarded in this action pursuant to 42 U.S.C. § 1988.

61. Dr. Kapur's conduct, acts, and omissions were grossly and recklessly indifferent to Ms. Buchanan's serious medical needs, thereby justifying the imposition of punitive damages.

WHEREFORE, Ms. Buchanan seeks damages from Dr. Kapur in an amount that is fair and reasonable, attorney's fees and costs, punitive damages sufficient to punish and to deter Dr. Kapur and others from similar conduct in the future, and such other and further relief as the Court deems appropriate.

### COUNT II – MEDICAL NEGLIGENCE
### (against Dr. Kapur)

62. Plaintiff realleges and incorporates paragraphs 1 through 61 as though fully set forth herein.

63. Dr. Kapur failed to use such care as a reasonably prudent healthcare provider would use under the same or similar circumstances in evaluating, observing, diagnosing, caring for, and treating Ms. Buchanan and was thereby negligent in that, among other things, Dr. Kapur:  failed to timely perform, and perform generally, a complete and proper physical evaluation of Ms. Buchanan; failed to timely review, and review generally, Ms. Buchanan's medical file or take a proper medical history; failed to timely administer, and administer generally, proper tests to evaluate potential cardiac and pulmonary issues; failed to timely refer, and refer generally, Ms. Buchanan to the appropriate specialists; failed to timely order, and order generally, the proper follow-up procedures necessary to treat Ms. Buchanan's cardiac and pulmonary injuries; and/or improperly considered the financial impact on Corizon of adequately treating Ms. Buchanan over Ms. Buchanan's medical needs.

64. Dr. Kapur's negligence and carelessness directly and proximately caused, or contributed to cause, the injuries and damages set forth herein.

65. Dr. Kapur was at all times pertinent to this matter acting individually and within the scope and course of his employment or agency with Corizon.

66. Dr. Kapur's conduct, acts, and omissions were grossly negligent and demonstrated a complete indifference to or reckless disregard for, the rights, safety and welfare of Ms. Buchanan, thereby justifying the imposition of exemplary or punitive damages.

WHEREFORE, Ms. Buchanan seeks damages from Dr. Kapur in an amount that is fair and reasonable, punitive damages sufficient to punish and to deter Dr. Kapur and others from similar conduct in the future, and such other and further relief as the Court deems appropriate.

### COUNT III – DELIBERATE INDIFFERENCE TO SERIOUS MEDICAL NEEDS
### (Against Corizon)

67. Plaintiff realleges and incorporates paragraphs 1 through 66 as though fully set forth herein.

68. Ms. Buchanan's heart attack and collapsed lung constituted serious medical needs recognizable by a layperson as necessitating immediate medical attention.

69. Ms. Buchanan was injured by the policies, procedures, customs, and official actions of Corizon, which amounted to deliberate indifference to her serious medical needs including, but not limited to:

   (a) policies, procedures, and customs allowing personnel to contradict and ignore medical results, findings, and recommendations provided by off-site treating physicians;

   (b) policies, procedures, and customs resulting in the maintenance of insufficient personnel, materials, and supplies to provide timely medical diagnoses and treatment;

    (c) policies, procedures, and customs emphasizing cost savings and corporate profits over the medical well-being of patients; and

    (d) policies, procedures, and customs compensating employees and administrative personnel on the basis of corporate profits, thereby creating an incentive for its employees to deny medical treatment if perceived to be costly.

  70. The policies, procedures, customs, and official actions of Corizon resulted in violations of Ms. Buchanan's rights under the Eighth Amendment to the United States Constitution under the color of state law.

  71. The policies, procedures, customs, and official actions of Corizon proximately caused, or contributed to cause, the injuries and damages set forth herein.

  72. Ms. Buchanan may seek remedies for the injuries and damages caused by such constitutional violations pursuant to 42 U.S.C. § 1983.  Attorney's fees and costs may be awarded in this action pursuant to 42 U.S.C. § 1988.

  WHEREFORE, Ms. Buchanan seeks damages from Corizon in an amount that is fair and reasonable, attorney's fees and costs, punitive damages sufficient to punish and to deter Corizon and others from similar conduct in the future, and such other and further relief as the Court deems appropriate.

<strong><u>COUNT IV – MEDICAL NEGLIGENCE</u></strong><br><strong><u>(Again Corizon)</u></strong>

  73. Plaintiff realleges and incorporates paragraphs 1 through 72 as though fully set forth herein.

  74. Corizon, acting through its physicians, nurses, and administrative personnel, failed to use such care as a reasonably prudent health care provider would use under the same

15

or similar circumstances in evaluating, observing, diagnosing, caring for, and treating Ms. Buchanan and was thereby negligent in that, among other things, Corizon's employees and agents:  failed to timely perform, and perform generally, a complete and proper physical evaluation of Ms. Buchanan; failed to timely review, and review generally, Ms. Buchanan's medical file or take a proper medical history; failed to timely administer, and administer generally, proper tests to evaluate potential cardiac and pulmonary issues; failed to timely refer, and refer generally, Ms. Buchanan to the appropriate specialists; failed to timely order, and order generally, the proper follow-up procedures necessary to treat Ms. Buchanan's cardiac and pulmonary injuries; and/or improperly considered the financial impact on Corizon of adequately treating Ms. Buchanan over Ms. Buchanan's medical needs.

75. Corizon also directly, through its practices, procedures, and policies, failed to use such care as a reasonably prudent health care provider would use under the same or similar circumstances in observing, diagnosing, monitoring, caring for, and approving treatment or additional testing for Ms. Buchanan and was thereby negligent in that, among other things, Corizon's practices, policies, and procedures:  allowed administrative personnel to contradict treatment recommendations of and treatments prescribed by treating physicians; fostered an environment wherein an on-site treating physician's authority to override administrative decisions was non-existent or unclear; unnecessarily delayed treatment and provision of medication by, among other things, requiring administrative approval and failing to keep sufficient personnel, materials, and supplies available to meet patient needs; and emphasized cost savings and corporate profits over the medical well-being of patients.

76. Corizon's negligence and carelessness, both individually and through its employees and agents, directly and proximately caused, or contributed to cause, the injuries and damages set forth herein.

77. Corizon was, at all times pertinent hereto, acting directly by and through its employees and agents.

78. Corizon's conduct, acts, and omissions, both individually and through its employees and agents, were grossly negligent and demonstrated a complete indifference to or reckless disregard for, the rights, safety and welfare of Ms. Buchanan, thereby justifying the imposition of exemplary or punitive damages.

WHEREFORE, Plaintiff seeks damages from Corizon in an amount that is fair and reasonable, punitive damages sufficient to punish and to deter Corizon and others from similar conduct in the future, and such other and further relief as the Court deems appropriate.

Dated:  May 20, 2015                Respectfully submitted,

**HUSCH BLACKWELL LLP**

/s/ Jason Husgen
Jason Husgen No. 66761MO
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63105
(314) 480-1500 Telephone
(314) 480-1505 Fax
jason.husgen@huschblackwell.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on this 20th day of May, 2015, a copy of the foregoing was caused to be served upon Defendant Hari Kapur, M.D. at his last known home address and upon Defendant Corizon Health through its registered agent.


/s/ Jason Husgen